IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **TAMMY J. LAYCOCK,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. **14-cv-960-CJP**[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Tammy Laycock is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).

## Procedural History

Plaintiff applied for DIB and SSI on January 7, 2011. In both applications, she alleged disability beginning on February 10, 2010. (Tr. 12). After holding an evidentiary hearing, Administrative Law Judge (ALJ) Bradley L. Davis denied the application in a decision dated May 9, 2013. (Tr. 12-23). Plaintiff's request for review was denied by the Appeals Council, and the

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Doc. 9.

decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in his RFC analysis by failing to address evidence that did not support his conclusion and explaining why it was rejected.

2. The ALJ's credibility analysis was erroneous.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520;** ***Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.**

If the answer at steps one and two is "yes," the claimant will

3

automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984).** *See also Zurawski v. Halter*, **245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **91 S. Ct. 1420, 1427 (1971).** In

4

reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Davis followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date. He found that plaintiff had severe impairments of seizure disorder, migraine headaches, sleep apnea, obesity, narcolepsy, cataplexy, depression, and anxiety. (Tr. 14). He further determined that plaintiff's impairments do not meet or equal a listed impairment. (Tr. 15).

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the medium level, with physical and mental limitations. (Tr. 17). Based on the testimony of a vocational expert (VE), he determined plaintiff could not perform her past work, but could perform other jobs which exist in significant numbers in the national and local economy. (Tr. 12-23).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

Plaintiff was born in 1966 and was forty-three years old on her alleged onset date of February 10, 2010. She was insured for DIB through June 30, 2014.[3] (Tr. 256). She was five feet five inches tall and weighed one hundred and ninety-eight pounds. (Tr. 249). Plaintiff completed three years of college and had an associate's degree in early childhood development. (Tr. 54, 249). She previously worked as a bus driver, teacher's aide, and a tutor. (Tr. 50, 250).

In a function report submitted in January 2011, plaintiff stated that her depression leaves her frozen, and her seizures, migraines, memory issues, shaking hands, dizziness, and anxiety made her unable to work. (Tr. 259). She took Butanol and Topamax for her migraines, Cymbalta for depression, Depakote, Epitol, and Tegretol for seizures, Neurontin for hand tremors, and Trazodone for insomnia. (Tr. 252, 333).

Plaintiff did the laundry and made meals for her six children. (Tr. 260). She was able to make sandwiches, chicken nuggets, and spaghetti but could no longer make bigger meals. (Tr. 261). Plaintiff no longer had her driver's license and was unable to drive due to her seizures. She had difficulty taking care of her finances as a result of her poor memory. (Tr. 262).

Plaintiff claimed to have difficulty lifting, squatting, bending, standing, kneeling, talking, seeing, remembering, completing tasks, concentrating, understanding, and following instructions. She was easily sidetracked and had difficulty remembering verbal instructions. (Tr. 264).

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI. See, 42 U.S.C. §§ 423(c) & 1382(a).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on April 23, 2013. (Tr. 33-59). She was a single mother and lived in her house with five of her six sons. (Tr. 44-45, 50). In 2009, plaintiff was in a car accident where she rolled her vehicle. (Tr. 40). Prior to her accident she worked as a school bus driver and a teacher's aide. (Tr. 45, 54). She had an associate's degree and was in college working on obtaining a bachelor's degree when her accident happened. She no longer took college classes as a result of her accident. (Tr. 37, 54).

Plaintiff testified that she began having seizures as a result of her accident. (Tr. 40). She stated that her seizures caused frequent migraines and memory problems. (Tr. 39-43). Plaintiff said she had a seizure every six to eight weeks and after each seizure she had a migraine. (Tr. 39-40). She needed her day planner to help remember simple tasks and could not concentrate on a thirty minute television show. (Tr. 44, 47). Plaintiff also testified that she was frequently exhausted and slept most of the day while her children were at school. (Tr. 39, 43). After her alleged onset date, plaintiff attempted to sell candles online and work as a tutor for a friend's son to help pay her bills. She had to stop tutoring because she was unable to concentrate. (Tr. 37-38, 49).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical that comported with the ultimate RFC assessment. That is, a person of plaintiff's same age, education, and work history, that was capable of performing work at the medium level. The person could only perform simple

7

routine tasks with no more than superficial interaction with co-workers, supervisors and the general public. Additionally, the person could not climb ladders, ropes, or scaffolds, and must avoid work hazards. (Tr. 55).

The VE testified that the person would be unable to perform plaintiff's previous work. However, she could do jobs that exist in significant numbers in the national and local economies. Examples of such jobs are cleaner, laundry laborer, and hand packager. (Tr. 56). The VE testified that if the individual were to miss three or more workdays a month or be off task for twenty percent of an average work day it would preclude employment. (Tr. 57). The VE also testified that if the person's fine manipulation and motor skills were decreased from frequent to occasional usage it would be difficult to find a job she could perform. (Tr. 58-59).

### 3. Medical History

In January 2009, plaintiff presented to Integris Baptist Regional Health Center's Emergency room following a motor vehicle accident and reported a syncopal episode. (Tr. 385). Later that month, she was admitted at Integris for another syncopal episode and an abnormal EEG. (Tr. 390-401). She was diagnosed with probable epilepsy and started on Tegretol. (Tr. 401).

Plaintiff began seeing Dr. Bradford Stephens in December 2009. She indicated that she had monthly seizures, problems with memory, and Tegretol made her drowsy. Plaintiff stated that her frequent headaches were alleviated by Topamax. (Tr. 496). Dr. Stephens diagnosed plaintiff with seizure disorder and migraines. He started her on Depakote and continued her Topamax

prescription. (Tr. 498). Plaintiff saw Dr. Stephens six more times through August 2011. His diagnoses remained the same with the addition of depression and anxiety. (Tr. 499-511, 622-24). The majority of plaintiff's complaints remained consistent with the addition of hand tremors and decreased manual dexterity. (Tr. 508). Dr. Stephens regularly changed plaintiff's medications to help alleviate her symptoms. (Tr. 500-511).

In March 2010, plaintiff began seeing Gail Wilscam, MS, at Grand Lake Mental Health Center. Her mood was euthymic and she complained of depression, but her affect was appropriate and her attention span was good. (Tr. 456). She returned to Grand Lake in April and May with similar reports. (Tr. 454-55). In both May and August 2010, plaintiff returned to Integris with seizures and headaches. (Tr. 447, 469, 502). Her gate was unsteady and she reported dizziness. (Tr. 502). She underwent an MRI and a CT scan during these visits which returned unremarkable results. (Tr. 452-53, 473-74).

In October 2012, plaintiff began seeing neurologist Dr. Ajitesh Rai. (Tr. 668-71). He opined that plaintiff's chronic headaches were caused by overusing her medications. (Tr. 664). He also had plaintiff undergo several tests to determine the cause of her seizures and her problems with hypersomnia. (Tr. 660). Plaintiff's EEG was normal, but as a result of her sleep studies Dr. Rai diagnosed plaintiff with sleep apnea, narcolepsy with cataplexy. (Tr. 661, 680). Plaintiff had significant improvement of her headaches as a result of taking fewer medications, and her epileptic episodes diminished after discontinuing some of her anti-seizure medications. (Tr. 660, 717). In 2013, Dr. Rai

prescribed Provigil to help with her narcolepsy as she still had excessive daytime sleepiness with cataplexy spells. (Tr. 717).

### 4. Opinion of Treating Physician

In February 2011, Dr. Stephens completed a medical source statement evaluating plaintiff's capabilities. (Tr. 493-95). He opined that plaintiff could lift or carry five pounds frequently, ten pounds occasionally and could stand or walk for one hour continuously. Additionally, he stated that plaintiff could stand or walk for a total of three hours out of an eight hour workday, sit continuously for two hours at a time, and sit for a total of four hours out of an eight hour workday. (Tr. 493). Plaintiff should never climb or crawl, and could occasionally balance, stoop, kneel, crouch, reach, and handle. She was to avoid moderate exposure to extreme temperatures, weather, wetness and humidity, dust, and vibration. Dr. Stephens opined that plaintiff should avoid all exposure to heights and hazards and would need to occasionally lie down during a typical workday. (Tr. 494).

### 5. Consultative Examinations

In June 2011, Dr. Carla Waller performed a physical consultative examination. (Tr. 566-68). Dr. Waller's diagnostic impressions were a motor vehicle accident with rollover incident, migraine headaches, seizure disorder, cognitive impairment, and short-term memory issues. She noted plaintiff had difficulty with fine motor movements and quick movements in her fingers. Plaintiff had difficulty touching her thumb to her forefinger and Dr. Waller noted it took her three times as long as a normal applicant plaintiff's age. She

also had difficulty touching her nose, and had a positive Romberg's test. Dr. Waller stated that plaintiff had problems with toe and heel walking which was indicative of poor stability. She noted plaintiff fell when she stood with her eyes closed. (Tr. 568).

Plaintiff had two psychological consultative examinations performed by Dr. Derrise Garner, Psy.D. (Tr. 436-41, 582-85). Her first examination was performed in 2009. (Tr. 436-41). Dr. Garner's diagnostic impressions were cognitive disorder, NOS, sub dementia threshold memory and attention impairment, and recurrent severe major depressive disorder without psychotic features. (Tr. 441). She felt plaintiff could cognitively understand and remember simple instructions during a normal workday and could, at maximum, interact in a limited contact situation with the general public, work supervisors, and co-workers. (Tr. 440). She assigned plaintiff a GAF score of 42.[4] (Tr. 441).

Plaintiff's second psychological consultative examination by Dr. Garner was performed in August, 2011. (Tr. 582-85). Dr. Garner stated plaintiff had no evidence of significant dementia. Plaintiff's rote and working memory were in the borderline range, as was her general fund of knowledge. (Tr. 584). Additionally, her vocabulary skills were below average and she had abstract proverb interpretation. Plaintiff was able to understand moderately complex

---

[4] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

11

instructions during a normal workday, remember simple instructions, and persist on simple tasks. Dr. Garner felt plaintiff could, at maximum, interact in a limited contact situation with the public, work supervisors, and co-workers. Dr. Garner's diagnostic impressions were cognitive disorder, NOS, and recurrent severe major depressive disorder without psychotic features. She assigned plaintiff a GAF score of 42. (Tr. 585).

### 6. RFC Assessments

State agency physician James Metcalf assessed plaintiff's physical RFC in July 2011. He reviewed medical records but did not examine plaintiff. He felt plaintiff had no exertional limitations except she must avoid all hazards such as machinery and heights. (Tr. 573-80).

In August 2011, plaintiff's mental RFC was assessed by state agency psychologist Carolyn Goodrich, Ph.D. She felt plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, as well as interact appropriately with the general public. (Tr. 601-03).

## Analysis

Plaintiff first argues that the ALJ's decision is not supported by substantial evidence. She primarily argues that the ALJ erred in assessing her RFC by not addressing evidence from the state agency physicians that was in opposition to his opinion.

An RFC is "the most you can still do despite your limitations." **20 C.F.R. §1545(a).** In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in

the record." **Ibid**. Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record.

Plaintiff argues that the ALJ's analysis of Drs. Garner and Waller were unsupported and inadequate. "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." **Social Security Ruling 96-6p, at 2.** The ALJ is required by **20 CFR §§ 404.1527(f) and 416.927(f)** to consider the state agency physicians' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision. *Id.*

The Court first notes that the ALJ's analysis of Dr. Garner's opinions was clearly and appropriately weighed. He discussed how Dr. Garner's assessment was not consistent with plaintiff's daily activities and her course of treatment. He looked at the mental health symptoms Dr. Garner identified and reconciled those with his RFC assessment. Therefore, as the Commissioner argues, the ALJ appropriately evaluated Dr. Garner's opinions. However, the ALJ's analysis of Dr. Waller's opinion was not as thorough.

First, the ALJ failed to discuss the amount of weight he gave Dr. Waller's opinion specifically, as is required. He assumingly grouped her opinion in with the additional opinion evidence in the record from state agency medical consultants. ALJ Davis stated he accepted these opinions and gave them some

weight, but he failed to discuss the specifics of Dr. Waller's opinion in any detail. The Seventh Circuit has stated that when "evidence comes in the form of a medical opinion from a state agency physician, the agency's own regulations and rules require that the ALJ 'not ignore these opinions and must explain the weight given to the opinions in their decisions.' S.S.R. 96-6p, 1996 SSR LEXIS 3; *see also* 20 C.F.R. § 404.1527(f)." **Mckinzey v. Astrue, 641 F.3d 884, 891 (7th Cir. 2011).**

The ALJ very briefly directly noted Dr. Waller's findings when he discussed at all the medical evidence. (Tr. 20). He stated that Dr. Waller's findings were "normal except for diminished finger movements" and "the claimant had no sensory loss, positive pedal pulses and her wrist motion was normal." (Tr. 20). Dr. Waller did not just say plaintiff's finger movements were diminished and her wrist motion was normal, but that finger movements took plaintiff three times as long as someone her age. She stated that plaintiff had difficulty with fine motor movements and had difficulty touching her thumb to her forefinger, touching her nose, and had a positive Romberg's test. Dr. Waller also stated that plaintiff had difficulty with toe and heel walking which was indicative of poor stability. She noted plaintiff fell when she stood with her eyes closed.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the

evidence that undermines it." ***Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)**. The ALJ's failure to include Dr. Waller's additional findings is error.

Second, when the ALJ did look at Dr. Waller's findings, he failed to include evidence contrary to his opinion. (Tr. 20). He stated that Dr. Waller's findings were "normal except for diminished finger movements" and "the claimant had no sensory loss, positive pedal pulses and her wrist motion was normal." (Tr. 20). Dr. Waller did not just say plaintiff's finger movements were diminished and her wrist motion was normal, but that finger movements took plaintiff three times as long as someone her age. She stated that plaintiff had difficulty with fine motor movements and had difficulty touching her thumb to her forefinger, touching her nose, and had a positive Romberg's test. Dr. Waller also stated that plaintiff had difficulty with toe and heel walking which was indicative of poor stability. She noted plaintiff fell when she stood with her eyes closed.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." ***Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)**. The ALJ's failure to include Dr. Waller's additional findings is error.

The Commissioner states that it is unclear whether evidence that plaintiff's finger motion was "impaired somewhat" was contrary to the ability to perform work at the medium level. She states that "there is nothing in Dr. Waller's report that requires a finding that Plaintiff does not have the ability to

perform frequent or even constant handling and fingering." This Court reads Dr. Waller's opinion from a commonsense standpoint, and determines her statement that plaintiff had difficulty with fine motor movements and quick motions of the fingers means that, while plaintiff could perform these tasks she would have difficulty performing them.

The Commissioner then argues that even if this was error, plaintiff must show how it is prejudicial. Plaintiff discussed how the issues with her manual dexterity directly impacted the jobs that the VE stated plaintiff could perform. She cited the Dictionary of Occupational Titles requirements for the jobs the VE said plaintiff could perform with the ALJ's RFC restrictions, and noted that all of them require frequent to constant handling and fingering. Moreover, when plaintiff's attorney questioned the VE regarding issues with manual dexterity and the occupational base, he stated that *any* impact with manipulation would have a negative impact on the jobs plaintiff would be able to perform.

Additionally, **SSR 85-15** states that "[r]eaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs. Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do." Since the evidence that plaintiff's limited manual dexterity could have an impact on the disability determination, the ALJ's failure to address

that evidence requires remand. ***Spaulding v. Halter,* 11 Fed. Appx 596, 600 (7th Cir. 2001).**

Finally, **SSR 96-08** states that an RFC assessment must include a thorough narrative discussion and analysis describing how the evidence supports each conclusion and must discuss any inconsistencies or ambiguities with the medical record. The Court notes that the ALJ spent a majority of his opinion reciting portions of the record and very little time on actual analysis. The ALJ must build a logical bridge to his conclusions which requires more than a mere recitation of the record. **See, *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir.2005); *Barrett v. Barnhart,* 355 F.3d 1065, 1068 (7th Cir.2004), *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011).** ALJ Davis simply failed to provide this RFC analysis in his opinion. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." ***Kastner v. Astrue,* 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other points, but, as in ***Pierce***, the determination of the weight to be given to plaintiff's treating physicians' opinions and of plaintiff's RFC will require "a fresh look" after reconsideration of plaintiff's credibility. ***Pierce v. Colvin,* 739 F.3d 1046, 1051 (7th Cir. 2014).**

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled

17

or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

### Conclusion

The Commissioner's final decision denying Tammy Laycock's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: October 29, 2015.**

**s/ Clifford J. Proud**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**